Judgment for plaintiff.

UTICA,
July, 1834.

Jack
v.
Martin.

---

## JACK, a negro man, *vs.* MARY MARTIN.

Where a *slave* escapes from one state into another, and is pursued by his owner and taken before a magistrate, and the magistrate *in pursuance of the law of congress*, examines into the matter, and grants a certificate that the slave owes service or labor to the person claiming him, and allows the claimant to remove him to the state from which he fled, the claimant cannot be prevented from removing him by a writ *de homine replegiando*, sued out under the authority of a state law.

The right of legislation on this subject belongs *exclusively* to the national government; and if such right be conceded to have been originally *concurrent*, after the exercise of its power by the *national government*, all control over the subject by the *state governments* necessarily ceases, so as to avoid the effects of adverse and conflicting legislation. In cases of collision, *state laws* yield to the superior authority of the laws of the *general government*.

To entitle the owner of a 'slave to the benefit of the provisions of the *constitution and law of the United States* in this respect, it is not necessary that he should be a *citizen of the state from which the slave fled*; it is only incumbent upon him to show, that under the laws of the state from which the slave escaped, he is entitled to the service or labor of the slave.

*It seems*, that the owner, or his agent, may, in the first instance, *without process*, arrest a fugitive slave.

Where, in *replevin*, there are several avowries, all substantially presenting the same defence, and the defendant succeeds upon one avowry, and judgment is rendered upon the whole record in his favor, leaving the issue upon the other avowries undisposed of, the judgment will not for such cause be rever-

sed, if it be manifest that had such other issues been tried and found for the plaintiff, the court would have given judgment for the defendant, *non obstante veredicto.*

ERROR from the superior court of the city of New-York. *Jack* sued out a writ *de homine replegiando,* in which, after alleging that he, *a negro man,* was in the custody of *Mary Martin,* and that she claimed him as a *slave,* or a person who owed her service, and that she detained him on that account, the sheriff was commanded to cause *Jack* to be replevied, and to summon *Mary Martin* to answer, &c. On the return of the writ, a declaration was filed, containing three counts ; in the *first,* it is alleged that *Mary Martin,* on the 20th August, 1833, at the city and county of New-York, took Jack, and him still holds ; in the *second* count, it is alleged that, on, &c. at, &c. the defendant falsely and maliciously took and held the plaintiff for a long space of time, and him still holds, upon the false pretence and allegation that he is her *slave,* and that she has the right to transport him without the jurisdiction of the state of New-York, to wit, to New-Orleans ; whereas, on the contrary, it is alleged that the plaintiff is a *freeman,* to wit, at, &c. The *third* count is like the *second,* omitting the words *falsely and maliciously.*

The defendant put in *three avowries :* In the first, she avows the taking and detaining, because, on the 27th February, 1830, *at New Orleans, in the state of Louisiana,* Jack was and ever since hath been and still is *the slave of the defendant,* and, as such slave, bound to labor for, and owing service to her under the laws of the state of Louisiana for and during his life to wit at, &c. The defendant avers, that during all the time aforesaid, she was and still is *an inhabitant of New-Orleans ;* that on the 5th of April, 1830, Jack escaped from thence and fled to New-York, a fugitive from his service and labor ; that on the 7th August, 1833, she presented to the recorder of New-York an affidavit, setting forth her claim to the services of Jack, and his escape and fleeing into the state of New-York, and that he was then in the city of New-York : that the recorder issued a writ of *habeas corpus,* directed to the sheriff of New-York, commanding Jack to be taken and brought before him on the next day ; that the sheriff accord-

ingly brought him before the recorder, who *proceeded to hear*
*the proofs and allegations of the defendant and of Jack touch-*
*ing the matter of such suit,* and such proceedings were there-
upon had, that afterwards, to wit, on the 23d August, it did ap-
pear to the recorder that the defendant was entitled to the
services of Jack, and he therefore *granted a certificate* to the
defendant, stating, among other things, that it satisfactorily ap-
peared that Jack owed service to the defendant, a resident of
the city of New-Orleans, in the state of Louisiana, but then in
the city of New-York, and allowing the defendant, or any
agent by her to be appointed, to take Jack through and out of
the state of New-York, on the direct route to New-Orleans,
setting forth the age, size and marks distinguishing Jack; that
Jack was then delivered by the recorder to the sheriff of New-
York, who was appointed by the defendant to receive him for
the purpose of his removal to New-Orleans; wherefore, the
defendant says she took Jack and detained him, as it was
lawful for her to do, for the causes aforesaid, and this, &c.;
wherefore she prays judgment and a return, &c. In the *sec-
ond* avowry, she says she took Jack, and detains him, be-
cause he was and still is her *slave,* and this, &c.; wherefore
she prays judgment and a return, &c. The *third* avowry is
substantially like the first.

To the *first avowry,* the plaintiff put in three pleas: *first,*
(after protesting that no such certificate was granted by the
recorder as stated in the avowry,) that the *defendant,* at the
time when &c. was and still is wholly and entirely *a resident
of the city and county of New-York,* and not of the city of New-
Orleans, and this, &c.; wherefore the plaintiff prays judg-
ment and his damages, &c. *Second.* That the defendant, at
the time when &c. was *a citizen of the state of New-York, and
could not lawfully hold the plaintiff as a slave,* and this, &c
wherefore, &c. *Third.* That heretofore, while the *defendant*
held the plaintiff to service, and claimed that he was her
slave by the law of the state of Louisiana, she was a resident
of New-Orleans, but that on the 1st March, 1833, she re-
moved from New-Orleans to New-York, and thereby became
a resident of the city of New-York and a citizen of the state

UTICA,
July, 1834.

Jack
v.
Martin.

of New-York, *by means whereof the plaintiff became a free-man;* and this, &c. wherefore, &c. To the *seconda vowry,* the plaintiff pleads that at the time when, &c. *he was not the slave of the defendant,* but was a *freeman,* concluding to the country with a *similiter;* and to the *third avowry,* a like plea as the last, concluding with a verification and prayer of judgment.

To the *three pleas* put in by the plaintiff to the *first avowry,* the defendant *demurred;* and as to the plea of the plaintiff to the *third avowry,* the defendant joined issue.

The superior court decided the three pleas to the first avowry to be bad, and gave judgment for the defendant; that the plaintiff take nothing by his writ, but that he and his caution &c. be in mercy, &c. and that the defendant go thereof without day, &c. Whereupon, a writ of error was sued out, removing the record into this court. The cause was brought to a hearing in this court in *May term last,* and was argued by *J. I Roosevelt, jun. & R. Sedgewick,* for the plaintiff in error, and *C. O'Connor,* for the defendant in error.*

*By the Court,* NELSON, J: The constitution of the United States, art. 4. sec. 2, sub. 3. provides, that "no person held to service or labor in one state, under the laws thereof, escaping into another, shall, in consequence of any law or regulation therein, be discharged from such service or labor; but shall be delivered up on claim of the party to whom such service or labor may be due." At the second session of the second congress under the constitution, an act was passed to carry into effect this part of the forgoing article, substantially as follows: That when any person held to labor in any of the United States, or in either of the territories under the laws thereof, shall escape into any other of the said states or territories, the person to whom such labor may be due, his agent or attorney, is empowered to seize or arrest such fugitive, and to take him or her before any judge of the circuit or district courts of the United States, residing or being within the state, or before

---

* This case has been removed into the *court for the correction of errors,* and as it was there more fully discussed than in this court, the reporter suspends giving a view of the *arguments of counsel* until the decision of that court.

any magistrate of a county, city, or town corporate, wherein such seizure or arrest shall be made; and upon proof, to the satisfaction of such judge or magistrate, either by oral testimony or affidavit, taken before and certified by a magistrate of any such state or territory, that the person so seized, doth, under the laws of the state or territory from which he or she fled, owe service to the person thus claiming him or her, it shall be the duty of such judge or magistrate to give a certificate to the claimant, his agent, or his attorney, which shall be a sufficient warrant for removing the fugitive to the state or territory from which he or she fled. The 4th section of the act makes it penal for any one knowingly to obstruct or hinder such claimant, agent or attorney, in seizing or arresting the fugitive, or for rescuing him after arrest, in pursuance of the authority given in the 3d section; or for harboring or concealing him or her, knowing him or her to be a fugitive from labor as above. The case under consideration is supposed to involve the constitutionality of this law of congress, and in result that of this state, 2 R. S. 560, § 6 to 19 inclusive, which provides for the arrest of fugitive slaves in a manner in some respects different from the law of Congress, and gives to a slave the writ of *homine replegiando* against the person or agent claiming his service, and suspends all proceedings before the judge or magistrate, and the caption or removal of such fugitive under the certificate, until final judgment shall be given on this writ.

This replevin suit is under the provision of the state law. The defendant, in the superior court, set up in defence the fact that the plaintiff was her slave, and acknowledged the taking, by virtue of proceedings alleged to be in conformity to the act of congress. The plaintiff replied, by way of plea, that at the time of the seizure, the defendant was a citizen of the state of New-York, and incapable by the laws of that state to hold him in slavery. Under a common principle of pleading, that every material fact properly set forth, and not denied by the adverse party, is admitted, the facts—that the plaintiff owed service to the defendant under the laws of the state of Louisiana; that he fled from that state and service into the state of New-York, remained there against her will, a fugitive from

her service, till the seizure ; and the seizure under the act of congress, as set forth in the avowry—are all admitted on the record. The demurrer also admits the fact set forth in the plea, i. e. that the defendant was a citizen of this state at the time of the arrest. If this plea should be determined defective, under another familiar rule of pleading, the plaintiff has a right on the argument to go back to the avowry and test its sufficiency ; and hence the question of the constitutionality of the law of congress and of the law of this state may be legitimately raised.

I assume, for the present, that the proceedings before the recorder were substantially in conformity to the act of congress, and may be sustained thereby if it is valid. In order to determine the force and effect of the respective statutes, and to ascertain which is entitled to paramount authority, we must go back to the source of power—the provision of the constitution ; that being conceded to be supreme, and any law in pursuance thereof controlling. The first clause is merely prohibitory upon the states, and forbids the enactment of any law, or the adoption of any regulation in the case of a fugitive slave, by which he may be discharged from the service of his master ; and this prohibition upon the state power thus far, is unqualified and complete, as it necessarily includes a restriction against any measure tending in the slightest degree to impair the right to such service. No "law or regulation" of a state being permitted to discharge it, the claim or title of the owner remains as perfect within the jurisdiction of the state to which the fugitive has fled, after his arrival and during his continuance, as it was in and under the laws of the state from which he escaped. The service there due, and the escape being established, so explicit are the terms of the constitution, no rightful authority can be exercised by the state to vary the relation existing between *the parties.* To this very qualified extent, slavery may be said still to exist in a state, however effectually it may have been denounced by her constitution and laws. On this point there can be no diversity of opinion as to the intent and meaning of this provision ; the doubt arises upon the construction to be given to the next clause : "but shall be delivered up on

claim of the party to whom such service or labor may be due." The counsel for the plaintiff in error contends, the mode of making the claim, and of delivering up the fugitive is a subject exclusively of state regulation, with which congress has no right to interfere; 'and upon this view, the constitutionality of the law of this state is sought to be sustained. I apprehend it can be defended upon no other ground than the one taken; for if the power of the state to legislate on this subject is only concurrent with congress, after the exercise of it by that body in enacting the law of 1793, it would be incompetent for the state authorities to act in the matter. That law must be paramount, from necessity, to avoid the confusion of adverse and conflicting legislation. So far as the states are concerned, the power, when thus exercised, is then exhausted; and though they might have desired a different legislation on the subject, they cannot amend, qualify, or in any manner alter it. This is the rule, as I understand it, settled by authority, in regard to the construction of the concurrent powers of legislation in the states, and which is conceded to be binding upon the state tribunals, on questions arising under the constitution and laws of the United States. *Sturgess* v. *Crowninshield*, 4 Wheaton, 193. *Houston* v. *Moore*, 5 id. 1. *See also Livingston* v. *Van Ingen*, 9 Johns. R. 561, 566, 568, 575. 13 Mass. R. 16. 3 Serg. & Rawle, 179. 1 Kent, 387. *Steamboat Co.* v. *Livingston*, 3 Cowen, 716, 751, 753. This principle is undoubtedly essential to peace and harmony in the action of the two governments. If the power of each in its sphere was exclusive throughout, there would be no reason or necessity for its application, for then there could be no collision without usurpation. But as there is a large mass of concurrent powers belonging in common to each in the arrangement of the system, confusion would have inevitably followed their operations, if one of them had not been made paramount. It was therefore provided, art. 6, sub. 2, that "this constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land, and the judges in every state shall be bound thereby, any thing in the constitution or in the

laws of any state to the contrary notwithstanding." Whenever congress can lawfully act under the constitution, and do act, their judgment and discretion are supreme over the subject under this provision; and, in the exercise of concurrent powers the states must necessarily be subordinate. Neither can the states exercise a concurrent power in conjunction with congress, without their express permission; for the right to do so would be in derogation of their paramount authority, and lead to all the evil it was designed to avoid. Though the act of the state might not be in direct repugnance to the legislation of congress, it does not follow that it is not so in legal effect; for it has been correctly said, that the will of congress may be discovered as well by what they have not declared as by what they have expressed; that two distinct wills cannot at the same time be exercised in relation to the same subject effectually, and at the same time be compatible with each other. If they correspond in every respect, then the latter is idle and inoperative; if they differ, they must, in the nature of things, oppose each other so far as they do differ. If this conclusion be correct, to sustain the legislature of the state under the clause of the constitution in question, it is indispensable to show their power to be exclusive, as congress have already passed a law to carry it into execution. It is material to look into the object of this clause of the constitution; the evil to be guarded against, and the nature and character of the rights to be protected and enforced, in order to comprehend its meaning, and determine what powers, and to what extent, may be rightfully claimed under it.

At the adoption of the constitution, a small minority of the states had abolished slavery within their limits, either by positive enactment or judicial adjudication; and the southern states are known to have been more deeply interested in slave labor than those of the north, where slavery yet to some extent existed, but where it must have been seen it would probably soon disappear. It was natural for that portion of the Union to fear that the latter states might, under the influence of this unhappy and exciting subject, be tempted to adopt a course of legislation that would embarrass the owners pursuing their fugitive slaves, if not discharge them from service,

and invite escape by affording a place of refuge. They already had some experience of the perplexities in this respect under the confederation, which contained no provision on the subject; and the serious and almost insurmountable difficulties that this species of property occasioned in the convention was well calculated to confirm their strongest apprehensions. To this source must be attributed, no doubt, the provision of the constitution, and which directly meets the evil, by not only prohibiting the states from enacting any regulation discharging the slave from service, but by directing that he shall be delivered up to the owner. It implies a doubt whether they would, in the exercise of unrestrained power, regard the rights of the owner, or properly protect them by local legislation. The object of the provision being thus palpable, it should receive a construction that will operate most effectually to accomplish the end consistent with the terms of it. This we may reasonably infer will be in accordance with the intent of the makers, and will regard with becoming respect the rights of those especially interested in its execution. Which power then, was it intended should be charged with the duty of prescribing the mode in which this injunction of the constitution should be carried into effect, and of enforcing its execution— the states or congress? It is very clear, if left to the former, the great purpose of the provision might be defeated, in spite of the constitution. The states might omit any legislation on the subject, and thereby leave the owner without any known means by which to assert his rights : or they might so encumber and embarrass the prosecution of them, as that their legislation on the subject would be tantamount to a denial. That all this could not be done or omitted without disregarding the spirit of the constitution is true ; but the provision itself is founded upon the assumption that without it the acknowledged rights of the owners would not be observed or protected ; it was made in express terms, to guard against a possible act of injustice by the state authorities. The idea that the framers of the constitution intended to leave the regulation of this subject to the states, when the provision itself obviously sprung out of their fears of partial and unjust legislation by the states in respect to it, cannot readily be admitted.

UTICA,
July, 1834.

Jack
v.
Martin.

It would present an inconsistency of action and an unskilfulness in the adoption of means for the end in view, too remarkable to have been overlooked by a much less wise body of men. They must naturally have seen and felt that the spirit apprehended to exist in the states, which made this provision expedient, would be able to frustate its object in regulating the mode and manner of carrying it into effect. That the remedy of the evil, and the security of rights, would not be complete unless this power was also vested in the national government. This consideration requires additional force, when we take in connection the fact, that upon the supposition of exclusive state power to legislate, the owner could not resort to the national judiciary for an exposition of the state law, or to review the adjudications of the state tribunals. Their decision would be final. When the power of the state to legislate over a given subject is concurrent with congress, the appellate jurisdiction of the national judiciary may be invoked to review and correct the errors of the state judiciary. This right is derived from the clause in the constitution which provides, that " the judicial power shall extend to all cases in law and equity arising under this constitution, the laws of the United States, &c." Art. 3, sec. 2. See also, sub. 2, which gives appellate jurisdiction, and is deemed essential to the authority and efficiency of the general government. If the power of the state legislature is exclusive, it is then like the great mass of powers belonging to it, and where the law can be expounded and enforced only by the state tribunals, with the excepted case of the owner being a resident of another state. The right of review would then rest upon the residence of the party, and not upon the nature of the subject matter, and in no way weakens the view taken. Upon the construction, then, contended for by the plaintiff in error, whatever might be the regulation of the states as to the claim of the owner under the constitution, or however vexatious and embarrassing might be the conditions annexed to the surrender of the fugitive, their action would be final and conclusive, and beyond the reach of the national government to afford a remedy.

I am also satisfied, from an attentive perusal of this provision, that a fair interpretation of the terms in which it is ex-

pressed, not only prohibits the states from legislation upon the question involving the owner's right to this species of labor, but that it is intended to give to congress the power to provide the delivering up of the slave. It is peremptory and unqualified, that he "shall be delivered up upon claim of the party to whom such service or labor may be due." The right of the owner to reclaim the fugitive in the state to which he has fled has been yielded to him by the states. Without this provision, it would have been competent for them to have wholly denied such claims, or to have qualified it at discretion. All this power they have parted with; and the owner now has not only an unqualified right to the possession, but he has the guaranty of the constitution in respect to it. It is obvious if congress have not the power to prescribe the mode and manner of the "delivering up," and thereby provide the means of enforcing the execution of the rights secured by this provision, its solemn guaranty may be wholly disregarded, in defiance of the government. This power seems indispensable to enable it faithfully to discharge the obligation to the states and citizens interested. The subject itself, as well from its nature as from the persons alone interested in it, seems appropriately to belong to the national government. It concerns rights held under the laws, to be enforced within the jurisdiction of states other than those in which the citizens generally interested in them reside, and on a subject, too, known deeply to affect the public mind, and in respect to which distinct and adverse interests and views had already appeared in the Union. It was therefore fit and proper that the whole matter should be placed under the control of congress, where the rights and interests of the different sections of the country, liable to be influenced by local and peculiar causes, would be regulated and enforced with an independent and impartial regard to all. It was a subject affecting citizens at the time, more or less in almost every part of the union—a uniform rule respecting which was desirable, and could be attained only by placing it under the action of the national government. We may add also, that as the power of legislation belonging to the states is in no instance derived from the constitution of the United

States, but flows from their own sovereign authority, any law they might pass on the subject would not be binding beyond their jurisdiction, and any precept or authority given in pursuance of it would convey none to the owner to remove the fugitive beyond it ; the authority of each state through which it was necessary to pass would become indispensible.

The above view is in strict accordance with the decisions of this court upon the clause in question, as far as it has come under consideration, and also with those under the analagous provision respecting fuigtives from justice.   The case of *Glen v. Hodges*, 9 Johns. R. 67, was an action of trespass for taking out of .the possession of a citizen of this state a negro slave who had escaped into Vermont.   The owner pursued and seized him there, and he was forcibly taken out of his custody by a public officer, under the attachment law of -that state for debt, and which was set up in justification by the defendant, in whose favor it issued.   The court say, " he (the slave) was held to service or labor under the laws of this state when he escaped, and the escape did not discharge him, but the master was entitled to reclaim him in the state to which he fled.   This is according to a provision in the constitution of the United States, art. 4 § 2, and the act of congress of 12th February, 1793, Laws of U. S. vol. 2, 165.   The court decided, that the proceedings under the attachment, which were regular,. formed no justification for the taking : so complete was the right of the owner under the constitution and laws.· The provision of the constitution respecting fugitives from justice, is found in the same section and article with the one in question, and is as follows : " A person charged in any state with treason, felony or other crime, who shall flee from justice and be found in another state, shall on demand of the executive authority of the state from which he fled, be delivered up to be removed to the state having jurisdiction of the crime."   The same act of congress of 1793, has provided for carrying this provision into effect.   It is quite clear, from the language of this provision, that 'the arguments in favor of the power of exclusive state legislation, and of course to regulate the manner of charging the crime, of making the demand by the executive, and of delivering up the fugitive to be remov-

ed, is stronger, and the reasons against the practical exercise of it, independently of the language, much less cogent and conclusive than those under the clause in question. Every state is alike interested in the detection and punishment of public offenders, and there could be but little apprehension that this provision would not have been faithfully executed under the regulation of state authorities; yet the power of congress over the subject has never been doubted in this state so far as my observation extends, nor have the states under-taken to legislate in respect to it. In the matter of *Clark*, 9 Wendell, 219, which was a case under this clause, the chief justice recognized the binding effect of the law of 1793, and considered the proceedings in conformity to it as conclusive upon the state courts. The prisoner, in that case, offered to prove, upon the return of the *habeas corpus*, the charge of the offence upon him, specified in the warrant of the governor by which he was arrested, to be untrue. But this court consid-ered the inquiry, even as to probable guilt, precluded by the constitutional provision, and the law in pursuance of it—these being complied with, the right to the removal was complete under the paramount authority.

Great consideration, also, we think due to the law of 1793, as a contemporaneous exposition of the constitutional pro-vision. It was passed about four years after the adoption of the constitution, by a congress which included some of the most distinguished members of the convention. At the dis-tance of forty years, we should hesitate long before we came to the conclusion that an error was committed in the con-struction of this instrument under such circumstances, and which has been ever since acquiesced in, so far as we know, without question. Our own statute books also show, that down to 1830, no attempt had been made here by state le-gislation to interfere with this regulation of congress. To acknowledge the existence of such a power, we must also overlook the negative opinion of our own eminent statesmen, who participated actively and zealously in the scenes of that period; many of whom, too, were adverse to the adoption of the constitution, under a belief, among others, that the power of the states was too much crippled.

UTICA,
July, 1834.

Jack
v.
Martin.

Whether the power of congress is exclusive or concurrent with the states it is unimportant to examine, as we have already seen, when congress acts upon the subject, it becomes entire and exclusive. While the law thus passed exists, the concurrent power of the states is suspended, and for the time is as inoperative as if it never had existed. If this principle is sound, or rather if it is settled by the authoritative expositors of all questions arising under the constitution and laws of the United States, it inevitably follows that the law of 1830 must yield. However wise and expedient we may consider its provisions, and though we might, in our individual opinion, give preference to the system there prescribed for carrying into execution this clause of the constitution, we are compelled to say the one defined by the law of congress is of paramount authority. Having the power over the subject, the manner it should be carried into effect rested in their discretion, and they have left nothing to state regulation. To show that the two acts are repugnant to one another, it is not necessary to resort to the argument before referred to, that the will of congress may be discovered as well by what they have not declared as by what they have expressed. Here is a direct conflict between the two powers. The very question in the case is, which shall give way? Shall the certificate of the magistrate, under the law of 1793, which declares it " shall be a sufficient warrant for removing the fugitive from labor to the state or territory from which he fled," be permitted to perform its office? or shall the writ under the state law prevent it? They are antagonist and irreconcilable powers, and the case forcibly exemplifies the impracticability and danger of the exercise of both upon the same subject, and the wisdom of the rule that forbids it. It has been said, that under the law of 1793, a free citizen might be seized and carried away into captivity, and hence the necessity of the law of the state giving to him a trial by jury upon the question of freedom. This argument is plausible, and the justice of it difficult to deny; but, sound as it is, it tends only to prove the defectiveness of the law of congress, not the authority of the state. It would be appropriate and pertinent when urged before that body to effect an amendment of the law, but would be a most sweeping

and dangerous position, if sufficient to justify the authority to amend it by state legislation. The same argument also might be used, with a greater show of reason, in favor of the power of the state to regulate the surrender of fugitives from justice. An innocent and unoffending citizen may be seized and removed to another state, upon a charge involving his life. In the case of *Clark*, before referred to, his allegation of innocence might have been true; but the governor of this state, on the demand of the executive of the state of Rhode Island, accompanied with an affidavit, made before a magistrate of that state, was bound to give him up, and the judicial authorities could not interfere. In that case, all the substantial proceedings upon which the arrest and removal were effected, were nescessarily those before officers of other states. In the case under review, the proceedings are before a magistrate of our own state, presumed to possess a common sympathy with his fellow citizens, and where, upon the supposition that a freeman is arrested, he may readily procure the evidence of his freedom. If the magistrate should finally err in granting the certificate, the party can still resort to the protection of the national judiciary. The proceedings by which his rights have been invaded being under a law of congress, the remedy for error or injustice belongs peculiarly to that high tribunal. Under their ample shield, the apprehension of captivity and oppression cannot be alarming.

That the proceedings before the magistrate were in form under the law of the state which required the issuing of a writ of *habeas corpus*, 2 R. S. 560, § 6, I apprehend, cannot materially affect this case. Whether the owner or agent might have made the, arrest in the first instance without any process, we will not stop to examine: authorities of deserved respectability and weight have held the affirmative. 2 Pick. 11, 5 Serg. & Rawle, 62, and the case of *Glen* v. *Hodges*, in this court, before referred to, seem to countenance the same conclusion. It would indeed appear to follow as a nescessary consequence, from the undoubted position, that under this clause of the constitution, the right and title of the owner to the service of the slave is as entire and perfect within the jurisdiction of the state to which he has fled, as it was in the one from

UTICA,
July, 1834.

Jack
v.
Martin.

which he escaped. Such seizure would be at the peril of party ; and if a freeman was taken, he would be answerable like any other trespasser or kidnapper. It is sufficient for this case, that the plaintiff was brought before an officer authorized by the law of congress to hear and determine the question and grant the certificate ; that such hearing did take place, and that the certificate was granted. Neither is it important to enquire whether such officer was bound to act under the law of congress, or whether he would expose himself to the penalties of the statute of this state, for proceeding in any other way than in conformity to its provisions. It is sufficient for the owner, that he did act in the matter substantially in conformity to the law of 1793, and gave to him the certificate there prescribed as his authority for removal. This is a full compliance with the law under which he seeks to reclaim the fugitive, and he is entitled to the benefit of its provisions, in this if in any case, against the state law.

The conclusion to which we have arrived upon the leading principles of the case supersedes the necessity of ascertaining the true meaning and effect of section 12, 2 R. S. 561, which declares that the certificate shall authorize the person having the same to remove the fugitive through and out of the state, on the direct route to the place of the residence of the claimant. It was obviously drawn under the idea that the claimant in all possible cases would be a resident of another state. For it cannot be doubted, that under the provision of the constitution and laws of congress, the right to this species of service is protected without regard to the residence of the owner. It is the title to such service, under the laws of the state from which the fugitive fled, which brings the case within its protection. This fact must be established before the magistrate granting the certificate, and when established, the right becomes perfect. A citizen of this state is as much entitled to the benefit of this provision of the constitution as a citizen of Louisiana or elsewhere, and the legislation of the state is as inoperative in the one case as in the other. Upon any other construction the descent or devise of this species of property to a resident of this state, might operate as an immediate emancipation, if the slaves fled here. Giving to the law of congress a paramount

authority, supersedes the importance of this question arising upon the phraseology of the state law.

According to the view we have taken of the case, the first avowry of the defendant is sustained, and she is entitled to judgment thereon, unless some of the formal objections were well taken, which we will hereafter shortly examine. The pleas are no answer to it, and present immaterial issues, and so far as the state courts are concerned, the right set up in the avowry is *res judicata* under the constitution and law of the United States. The pleas to the second and third avowries take issue upon the fact alleged therein, that the plaintiff is the slave of the defendant; and a question has been raised, whether upon the record, under this view, the defendant is entitled to the judgment rendered by the superior court, which is confined to the first avowry. From our conclusion upon the main question involved, we cannot but see, that upon the whole record the defendant is entitled to judgment, notwithstanding the issues, upon the second and third avowries, and upon the supposition they would be determined in favor of the plaintiff. 1 Saund. 80, n. 1. 2 Burr, 755. 2 Cowen, 512. If either avowry constitutes a good defence to the replevin suit, it is sufficient, and judgment of return must be given. The case of *Pike* v. *Gandall*, 9 Wendell, 149, much relied on by the plaintiff, recognizes the above principle, but contains no authority for the position claimed by the plaintiff. There the defendant put in five cognizances, acknowledging the taking of the goods for rent; the plaintiff did not plead, and judgment of *non pros* passed against him. Two of the cognizances were substantially defective, and for this reason, the judgment, having been entered upon all of them, was reversed. Assuming that the avowries in this case must be viewed in the light of several counts in a declaration, as the cognizances were there, the one upon which the judgment is entered well sustains it; and the others presented either immaterial issues, or the determination of them either way could not vary the rights of the parties upon the whole record so long as the first was maintained. If the issues on the second and third avowries had been tried and found for the plaintiff, the superior court would have been bound to have given

judgment for the defendant upon the whole record *non obstante veredicto*.   2 Tidd's Pr. 830.   1 Burr. 301.   2 T. R. 758.   2 Cowen, 626.   One good count in a declaration, if sustained by proof, entitles the plaintiff to recover upon the whole record, though there may be several others which are bad, or found against him, if the judgment is confined to such good count.   So if one of several pleas of a defendant, which goes to the whole cause of action, is sustained, it constitutes a bar to the recovery of the plaintiff.

As to the formal objections to the avowry : 1. It is objected that it is defective in omitting to set out the laws of Louisiana under which slavery is tolerated, and that the presumption of law is against their existence.   No doubt, if the court are not warranted in taking official notice of the fact of the existence of slavery as a part of the public history of the country, (which I am inclined to think we are,) it is, necessary for the pleader to set it forth, to enable him to prove it, like any other fact in the case.   But then it is not material to spread upon the record specially the title under which slavery is claimed to exist, and the general averment in the avowry is sufficient.   It would have enabled the plaintiff to have put the fact in issue, if he had chosen to place the case upon that point.   Where a party relies upon the statute or common law of a foreign state or country, to sustain a proceeding had under and by virtue of it, such as an action upon a foreign judgment, it is no doubt material that he should set forth so much as may enable the court to see that the proceeding is in pursuance of the authority by which it is claimed to be sustained. 3 Wendell, 276.   id. 438.   10 id. 74.   2 East, 260.   This rule of pleading I apprehend should be confined to such cases, and those that fall within the reason of them.   It is in analogy to the rules of pleading applicable to courts of special and limited jurisdiction, and all others acting *quasi* judicially. We may also add, that according to the view of the case we have taken, the question of slave or not, according to the laws of the state from whence the fugitive fled, belonged to the magistrate under the law of congress to decide, and his decision is conclusive in the matter, so far as the state courts are concerned.   2. It is objected that the avowry contains no re-

erence to the law under which the proceedings have been had, by which the plaintiff was seized and held 'in custody. The answer is, that the court is bound to take judicial notice of the constitution, and of the law of congress in pursuance thereof; and the facts set forth in the avowry bring the case within them, and show the certificate therein prescribed, as the authority for the detention and removal. This is a full compliance with the law under which the owner puts forth his right to reclaim, and he is entitled to the benefit of it in this if in any case. 3. It is also objected that there is no averment in the avowry of due proof before the recorder, and that the plaintiff owed service to the defendant under the laws of Louisiana. The act of congress provides, that " upon due proof to the satisfaction of such magistrate, that the person so seized or arrested doth owe service to the person claiming him or her, it shall be the duty of such magistrate to give a certificate, &c. All this is substantially averred in the avowry ; besides, the decision of the magistrate and certificate is conclusive upon the fact as to the state court. 4. It is further objected that the avowry does not state before whom the affidavit of the defendant was made. The view we have already taken of the case renders it unimportant to examine as to the regularity of the issuing of the *habeas corpus*. The act of congress provides that the proof upon which the certificate shall be granted, may be either by oral testimony or affidavit, and the averment that the recorder heard the proofs and allegations of the parties, is sufficient within this law. It is not important further to notice the formal objections made to the avowries as they relate to proceedings under the statute of this state, which we have been compelled to put out of the case, after the fullest consideration.