## Case No. 16,240a.

### UNITED STATES v. SCHMIDT.

[See Case No. 16,316a.]

## Case No. 16,240b.

### UNITED STATES v. SCOTT.

[Betts, Scr. Bk. 221.]

District Court, D. Massachusetts. June, 1851.

CONSTITUTIONAL LAW — FUGITIVE SLAVE LAWS — EXECUTIVE AND JUDICIAL FUNCTIONS.

[1. Congress had power to pass the acts of 1793 (1 Stat. 302), and 1850 (9 Stat. 462), providing for the rendition of fugitive slaves. Prigg v. Pennsylvania, 16 Pet. (41 U. S.) 559, followed.]

[2. The rendition of a fugitive slave under the acts of 1793 and 1850 is an executive, and not a judicial, proceeding, and trial by jury is not necessary therein, under the federal constitution.]

[3. The fugitive slave acts of 1793 and 1850 are constitutional, although they provide for rendition by state officers. Prigg v. Pennsylvania, 16 Pet. (41 U. S.) 558, followed.]

[This was an indictment against James Scott for the rescue of one Shadrach, a fugitive slave.]

SPRAGUE, District Judge. It does not belong to the judiciary to decide upon the wisdom or expediency of acts of congress. But we must of necessity decide upon their constitutionality. In doing so, however, we must remember that we are sitting in judgment upon the action of another great coordinate department of the government, every member of which was under oath to support the constitution. We must begin the inquiry, then, with the presumption that their legislation is rightful.

Several objections are made to the act of 1850: First, that congress has no right to

legislate upon the subject; second, that the act does not provide for a trial by jury, as required by the seventh amendment of the constitution; third, that it gives the commissioners judicial power, which, by the third article of the constitution, can be exercised only by courts of the United States, held by judges appointed by the president and senate. These objections apply with equal force to the statute of 1793, for—First, that was legislation by congress; second, it did not provide for trial by jury; third, it not only authorized judges when not holding court, and out of their district, to hear the cause and grant a certificate, but also state magistrates who were not appointed by the president and senate, and held no office under the United States; and the certificate of such magistrate is made a sufficient warrant for the removal, and could be no more intercepted by habeas corpus, or other process, than can the certificate of the commissioner under the act of 1850.

We are under the necessity, therefore, of inquiring whether the act of 1793 be constitutional. The first objection has been solemnly and unanimously decided by the supreme court of the United States in a case where it was directly in issue, and which will hereafter be referred to. The last two objections are those which have been most strenuously urged, and to them, therefore, I shall more particularly direct my attention. Most of the remarks. however, which I shall make will apply with equal or greater force to the first. These questions are not new, nor do I propose to treat them as such. Still, it may be useful to look at them for a moment, as if now presented for the first time, and afterwards to consider the contemporaneous construction of the constitution by the statute of 1793, the practice and acquiescence under it, and the opinions and decisions of judges and courts, both state and national.

Do the proceedings prescribed by congress for the delivery of fugitives from labor require the exercise of judicial power by a court, or may they be summary before a magistrate? If the latter only, no one contends that there must be a trial by jury. Ever since the profound argument of Chief Justice Marshall in the house of representatives, in the celebrated case of U. S. v. Robins [Case No. 16,175]. more than fifty years ago, it has been the established doctrine and practice, that the delivering up a fugitive under a treaty is an executive, and not a judicial, proceeding. Such, also, has been the invariable practice in delivering up fugitives from justice under the constitution. Is not the case of a fugitive from labor to be classed with or governed by the principles of extradition? Compare this with extradition under a treaty. In both there is a claim that the person shall be delivered up as a fugitive, to be carried out of one jurisdiction into another. In both

the claim is made under a law established, in the one case by a treaty, and in the other by the constitution and statute. In one, the claim is made by a citizen, under an alleged right given by the law of his state; in the other, it is by an officer or agent, under an alleged authority given by his government. Thus far they are similar. But it is strongly urged that they differ in the purposes for which the delivery is made; that in the one case it is for a regular trial, and in the other as the absolute property of the claimant, who may immediately exact service, and treat the prisoner in all respects as a slave. The objection derives its apparent force from confounding, or, at least, blending two sources of power, that should be kept perfectly distinct. The certificate, of itself, gives no authority whatever to treat the party as a slave. It is merely a warrant to remove him to a certain place. If, while in transitu, or after the transportation, the claimant exacts service, he must find his justification, not in the certificate, but in the laws of the state where the service is required. The certificate is simply an authority for transportation, nothing more. Under this statute, therefore, as well as under a treaty, the party is delivered up, to be disposed of according to the laws of the state or country into which he is carried, without any stipulation what those laws shall be, or whether proceedings shall be there instituted by the government or the individual, or in what manner the law shall be administered, or its protection obtained. In making treaties of extradition, we have confidence that the foreign nation has laws, and that they will be properly administered. So, also, the framers of the constitution, and congress had confidence that our sister states had laws, and that they would be fairly administered. In 1794, the laws of Great Britain, authorising the impressment of seamen, were in full practical operation. Suppose the law of that country had authorized any officer to whom the fugitives should be delivered, at his option, to place him on board any British man-of-war, to serve indefinitely as an impressed seaman, and we had known such to be her law when we made the treaty of 1794 [8 Stat. 116]. would a delivery under that treaty have ceased to be a case of extradition, because by the known law of Great Britain, the man would be subject, at the will of the person receiving him, to be reduced to practical slavery? That such might be the fate of the alleged fugitive, might be a reason against making such a treaty, but, if we choose to make it, the delivery would still be extradition. The act of surrender. and the inquiries and proceedings which precede it, are the same, whether the subject be afterwards. by other laws, sent to a court of justice. or service in the navy.

The first case that arose under the treaty of 1794 was that of U. S. v. Robins, above re-

ferred to. He had been guilty of murder and mutiny on board a British frigate. Suppose that he was an impressed seaman, which is not improbable, and that the officer making the demand had informed our government that, by authority of law, he should, immediately upon receiving the fugitive, place him again in the naval service, from which he had escaped, and our executive had, thereupon, delivered him up, would that have changed the character of the act of delivery, or of the inquiries which preceded it? Instead of being delivered up to certain death, under the laws of Great Britain, as he was, he would have been delivered up to involuntary and coerced service, on board a man-of-war, at the pleasure of the commander. Still it would have been merely extradition under the treaty; the disposal of the fugitive being left to the laws of the country to which he was carried.

But even if the case of the fugitives from labor be not one of extradition, still we are to inquire whether it is judicial in the sense contended for. That certain facts are to be ascertained, and questions of law solved, does not render the proceeding judicial. This is to be done in all cases of delivering up fugitives from justice under the constitution of a treaty. Magistrates also in criminal examinations must investigate and form an opinion upon questions both of law and fact, and executive officers are often obliged to do the same, and to act upon the conclusions to which they arrive. This may be illustrated by the case already referred to. Robins, the alleged fugitive, was claimed on a charge of murder and mutiny on board a British frigate. It involved very difficult and important questions of law and fact; such as his identity. Had he sought an asylum in this country? Were the proceedings for his reclamation regular under the treaty? Was the officer presenting the claim duly authorized? Was the alleged act within British jurisdiction? Being on the high seas, was it not piracy, and to be punished in this country? These questions the president decided, with such legal advice as he chose to take, and issued his certificate or warrant for his surrender. The fugitive was soon after executed, as it was foreseen he would be. But this result had no tendency to change the character of the act of extradition.

A proceeding then is not judicial merely because a magistrate or officer must ascertain facts and law, and act thereon in a particular case. As a general rule, to render the proceeding judicial under our jurisprudence, the tribunal must have the power to render a judicial judgment as to the questions at issue, which, if not annulled by appeal or reversal, will conclude the parties in future controversy upon the same question. The matter in controversy becomes res judicata, judicially settled, and not open for future litigation between the same parties. It has been urged that this is not so, because after judgment upon a writ of entry the same question may again be litigated in a writ of right. This is a mistake. It is not the same question. The matters in issue in those two actions are quite different. The mere right is never in issue in a writ of entry. In a writ of entry on a disseisin, and a plea of nul disseisin, the only question is whether the defendant did disseise the plaintiff, and that, being adjudged, cannot be again litigated. The mere right may be afterwards tried, because it is legally a different question.

In order, then, to determine whether the proceedings before the commissioner are judicial, let us see what is the result. He is to grant or withhold a certificate. What is the legal force of that certificate? It is merely an authority to carry the person named from one state to another. This is its whole legal effect. What may be legally done with that person in the state to which he is carried depends upon the laws of that state, and not upon anything in the certificate. It is true that the certificate states that certain facts exist, that is, in the opinion of the commissioner. But those facts are not thereby judicially established, but may be controverted, in any future proceeding between the same parties, and the certificate would not be even admissible in evidence. Neither party would be precluded from immediately contesting the same question in any other proceeding. If, for example, a suit for assault and battery and false imprisonment were brought in the circuit court against the claimant, for the original arrest without a warrant, and the justification set up was that the plaintiff was a fugitive from labor, and were this question thus directly in issue, the certificate could not even be given in evidence, any more than the opinion of any other person.

But it is earnestly insisted that the facts to be found in the two cases of fugitives from labor and fugitives from justice are different; that in the latter the executive has only to find that the party is charged and has fled, whereas the commissioner has to find that the party actually owed service and has fled. But it is not the nature or importance of the facts to be ascertained that makes the inquiry judicial, but that a judicial judgment may be pronounced. Suppose the law had required only that the certificate should state that the fugitive was alleged or charged to owe service, would that have changed the legal character of the inquiry? It would have made the law more objectionable, but not have rendered the proceeding more or less summary. Suppose that a treaty, instead of saying that a person charged, should say that a person guilty of a crime in a foreign country should be delivered up. In such case, the president must be satisfied of the party's guilt, but thereupon his action in making the surrender and the consequences that would follow would be precisely the same as they now are, when he has ascertained that the person is charged. So if the law require an

examining magistrate to be satisfied that the accused is guilty before he issues his warrant for his commitment. In neither case would the guilt be res judicata, but open to contestation in any future inquiry.

It is said that in criminal cases the person may be arrested and confined without a judicial trial, because, by the social compact, every one has agreed that if suspected of crime he may be so dealt with. In the first place, the social compact is a mere theory. In the second place, it supposes an agreement to abide by all laws which society may make, civil, as well as criminal, besides which, running away from labor might be made a crime. The remark made in the opinion delivered in Prigg v. Pennsylvania, 16 Pet. [41 U. S.] 539, that a claim for a fugitive from labor was a case within the judicial power, was an obiter dictum, and can be reconciled with what was deliberately decided in the same case, only by supposing that the judge who delivered the opinion intended that congress might legislate for it as within the judicial power, and provide for its being tried by a court, not that they must do so.

Let us next consider what is the force of the contemporaneous construction of the constitution. Here we must remember that in construing the fundamental, as well as any other, law, the sole inquiry is, what was the intention of those who established it? The real intention of the people who adopted the constitution is to be ascertained. If in sixty years language has been deflected or acquired new shades of meaning, still our inquiry is, what was the sense in which it was originally used? How did those who adopted the constitution understand its language and provisions? Had the congress who passed the act in 1793 the means of knowing the views and intentions of those who adopted the constitution and amendments? The convention that framed the constitution closed their labors in September, 1787. The government went into operation on the 4th of March, 1789. Nearly the whole of the intervening time, and especially of the year 1788, was spent in earnest discussions of its provisions by the people and conventions in the several states. The amendments were framed and adopted by the first congress, under the lead of Mr. Madison, and subsequently established by the legislatures of three-fourths of the states. The act we are now considering was passed by the second congress in February, 1793. That congress met on the 24th day of October, 1791, and its members must have been elected some time previously. In 1788, therefore, when the constitution was before the people for adoption, and subsequently, when the amendments were submitted to them, every one of these members must have been of sufficient age, ability, and distinction to take a prominent part in the discussion and action which preceded and attended the adoption of the constitution and amendments, and they had been elected by the very

people who had adopted both, for the purpose of representing their views and intentions in carrying the constitution into effect by practical legislation. More than one-third of the members of the convention which framed the constitution were members of congress in 1793, and a still greater proportion of the members of the first congress, which adopted the amendments, were also members of the second congress when this act was passed. The act of 1793 bears the signature of Jonathan Trumbull, of Connecticut, as speaker, of John Adams as vice-president, and George Washington as president. Thomas Jefferson, Alexander Hamilton, and Henry Knox, were cabinet advisers; and among the members of congress at the time were Caleb Strong, Elbridge Gerry, George Cabot, Fisher Ames, Theodore Sedgwick, Artemas Ward, John Langdon, Roger Sherman, Oliver Ellsworth, James Hillhouse, Rufus King, Robert Morris, James Madison, and James Monroe. George Cabot was one of the committee of the senate which reported the bill, and it was subsequently sent to a committee of which Roger Sherman was also a member. Such men were members of the congress which passed the act of 1793 as being in accordance with the constitution. It was immediately sent forth, and put into actual practical operation amongst the same people who had so recently established the constitution. Was it a violation of that instrument? No motion was made nor voice raised for its repeal in either house of congress; no movement against it in any state legislature or popular assembly; no petition or remonstrance from any source whatever. No one appears to have doubted its constitutionality, and it was received, so far, at least, as the public records and the history of the times show, with the general, if not the universal, acquiescence of the generation which adopted the constitution. And it was not until years afterwards, and when a new generation had arisen, that its constitutionality was questioned.

It is now insisted that by this act congress was guilty of an unauthorized assumption of power, and a violation of personal liberty, by subjecting any party to a trial by an unconstitutional tribunal, and by the depriving him of the right of a trial by jury, as secured by the seventh amendment. How could this have happened? Was it a time of apathy and indifference? So far from it, the spirit of liberty was never higher or more vigilant in any people. They had just fought for it through a seven years' war, and endured extreme privations, sufferings, and sacrifices. Apprehension of abuse of power by the national government was not only keen, but almost morbid, producing the utmost vigilance and unsparing scrutiny. Let us recur to a few historical facts. The convention that framed the constitution closed their labors on the 17th day of September, 1787, and it was soon after submitted to the people for

adoption by conventions chosen for that purpose in the several states. The states came into it slowly and reluctantly. Eleven only acceded to it when it went into operation on the 4th of March. 1789. North Carolina and Rhode Island did not accept it until November, 1789, and May, 1790. During the whole year 1788 the question of its adoption was pending. Discussions before the people, and in their conventions, were able, earnest, and thorough. The objections to it all arose from the apprehension that the powers conferred on the general government would be so exercised as to endanger the rights of individuals and the states. Many of the states, in adopting it, recommended some further guaranty for liberty, and several would not have acceded to it but for the confident assurance that amendments would be made for that purpose. In this spirit the first congress assembled, and soon afterwards framed and adopted twelve amendments, all designed to be further securities for the rights and liberties of the people, and to make more explicit the powers of the general government. These amendments were submitted to the legislatures of the several states for ratification. The only objection made to them was that they did not go far enough, that there should have been other and further guaranties for liberty. All but two, however, were ratified by the states, and those two related merely to the compensation of members of congress. Ten amendments were thus adopted by congress and the states, and among them the seventh, which it is now insisted was violated by the statute of 12th of February, 1793, passed only a short time afterwards. The second congress assembled on the twenty-fourth day of October, 1791, and most of its members must have been chosen during, or immediately after, the discussion of those amendments in the states, and as true representatives to carry out the intentions of the people in adopting them. The spirit of the times may be still further illustrated: In this very year of 1793, exhausted, as the people had been, by their protracted struggle, prostrate, as they were, without means, without credit, yet a large portion of them were eager to rush into the vortex of the French Revolution, and wage a foreign war for liberty; and it required all the wisdom, firmness, and popularity of Washington himself to maintain his proclamation of neutrality. which was issued in April of that year. Jay's treaty, made in 1794, now so universally approved, was then, from the mere apprehension of its being adverse to liberty, met with the most vehement denunciation, not only by the press, but by public meetings from one end of the country to the other, and in congress produced one of the warmest contests and most memorable debates ever known in the halls of legislation. During the administration of the elder Adams, the single case of extradition which has been referred to, that of Robins, produced violent attacks upon the president, both in and out of congress. The passage of the alien and sedition laws in 1798, intended to protect the government, was deemed an assumption of power so dangerous to freedom as to throw the nation into a ferment, and arouse state legislatures to pass the celebrated resolutions of that year. Soon afterwards the administration was overthrown by one of the most vehement contests for political power that was ever waged, during which every measure of the government from its organization was severely scrutinized, and many of them unsparingly assailed as invading or dangerous to the rights of the people. Yet during all this time, and for many years afterwards, while the love of liberty was most fervid, watchful, and jealous, the constitutionality of this law was never questioned. Indeed, it has been acquiesced in by the whole people for fifty-seven years, during all which time not a movement has been made, in or out of congress, to repeal or impair its provisions. It has been carried into actual practical operation in most, if not all, of the free states which were original parties to the constitution. In this state, one the most remote from the slaveholding, it appears in [Com. v. Griffith] 2 Pick. 11, that both my excellent and able predecessors have had occasion to give construction to the act, and there are those who recollect that Judge Davis, so justly revered for wisdom and benevolence, in several instances, delivered up slaves pursuant to its provisions. This he did, not only by holding a court, for no entry or record was made, and no decree or judgment entered up, but acting as a judge or magistrate, summarily granted a certificate, which was merely a warrant to convey the person to a certain place, and then, being functus officio, had no further legal efficacy.

The intention of those who adopted the constitution must govern. It is their views which we are endeavoring to ascertain, and to that end what can be more satisfactory than such contemporaneous exposition, such practice and acquiescence of the fathers of the constitution, and all those who participated in its adoption, and their successors for more than half a century? Those who, impressed only with the feelings of the present time, find it difficult to believe that our fathers in the North could have intended to render persons of color liable to be carried out of the state as slaves without trial by jury, and with a hearing only before a magistrate, will find it useful to go back to the period when the constitution was established, and see the actual condition of things at that time. Then all the states, with the exception of Massachusetts. were to a greater or less extent slaveholding, and in this state it had been abolished only eight years before by her bill of rights. Connecticut and Rhode Island had in 1784 passed laws looking to its ultimate extinction. by providing that children born after that time should be free. All the men of that day

had been born in the midst of that institution, and had been accustomed to its practical operation. Runaway negroes were taken back to their masters generally, it is believed, by mere recaption, without legal process, certainly without trial by jury or formal protracted proceedings before a court of record. Massachusetts ratified the constitution on the 7th of February, 1788. She was the only free state, and the views and purposes of this commonwealth with respect to negroes coming from other states are shown by a statute passed by her on the 26th day of March of the same year, that is, within fifty days of her adoption of the constitution. That act is as follows: "Sec. 6. Be it further enacted," &c., "that no person being an African or negro, other than a subject of the emperor of Morocco, or a citizen of some one of the United States (to be evidenced by a certificate from the secretary of the state of which he shall be a citizen) shall tarry within this commonwealth for a longer time than two months; and upon complaint made to any justice of the peace within this commonwealth, that any such person has been within the same more than two months, the said justice shall order the said person to depart out of this commonwealth; and in case that the said African or negro shall not depart, as aforesaid, any justice of the peace within this commonwealth, upon complaint and proof made that such person has continued within the commonwealth ten days after notice given him or her to depart as aforesaid, shall commit the said person to any house of correction within the county, there to be kept to hard labor agreeably to the rules and orders of the said house, until the sessions of the peace, next to be holden within and for the said county; and the master of the said house of correction is hereby required and directed to transmit an attested copy of the warrant of commitment to the said court on the first day of their said session; and if, upon trial at the said court, it shall be made to appear that the said person has thus continued within the commonwealth contrary to the tenor of this act, he or she shall be whipped, not exceeding ten stripes, and ordered to depart out of this commonwealth within ten days; and if he or she shall not so depart, the same process shall be had and punishment inflicted, and so toties quoties."

Thus it appears that Massachusetts at that time made all negroes from other states, whether bond or free, unless the prescribed certificate of citizenship was produced, liable after remaining here two months, and a notice of ten days, to be sent by a single magistrate to the house of correction to hard labor until the next general sessions of the peace, which was held by justices of the peace, and then liable to be sentenced by that court to punishment by whipping, and ordered out of the state; and if this order were disobeyed, the same confinement in the house of correction and punishment by stripes might again be inflicted; and for every successive neglect of ten days to obey the order to depart from the state, the same proceedings might be repeated indefinitely. The reason why a certificate of citizenship protected the holder from being thus dealt with was, doubtless, because the constitution, which she had just before sanctioned, declared that "the citizens of each state shall be entitled to all the privileges and immunities of citizens in the several states." [Const. U. S. art. 4, § 2.] Verily, since the year 1788, when the constitution was adopted, we of Massachusetts and the North have undergone a change, but this cannot alter pre-existing facts. If from the progress of benevolence we have acquired a stronger sympathy for the African, a more zealous desire to aid and protect him, our change cannot retroact so as to change the views and intentions which actually existed at the time the constitution was adopted.

Let us now examine the opinions and decisions of courts and judges, state and national. The state courts have, in several instances, affirmed, and in no one denied, the constitutionality of the act of 1793. The supreme court of Pennsylvania, with Chief Justice Tilghman at its head, in the case of Wright v. Deacon, 5 Serg. & R. 62, after full consideration, decided that the act of 1793 was constitutional, that the party claimed as a fugitive was not entitled to a trial by jury, but the proceedings were to be summary, and that the certificate of a state judge, pursuant to the act, authorised the removal, and could not be intercepted by process from the state court, and a writ de homine repliegiando, which had issued under the state law, was quashed. Here the authority of the state magistrate and the legal effect of his certificate were directly in issue, and the pivot on which the decision turned. This was in 1819, more than thirty years nearer to the adoption of the constitution than the present. The next case was that of Com. v. Griffith, 2 Pick. 11. This was an indictment for assault and battery and false imprisonment against an agent who had seized a fugitive slave in order to carry him before a magistrate, pursuant to the statute. The court unanimously affirmed the power of congress to legislate upon the subject, and the constitutionality of the act of 1793. But Thacher, J., thought that by a true construction of the act, a warrant to arrest was required. The purpose of the arrest was to carry him before a magistrate pursuant to the statute, yet the constitutional authority of the magistrate was not discussed or questioned. This was in the year 1823. In Jack v. Martin, 12 Wend. 311, a certificate had been given by the recorder of the city of New York. A writ de homine repliegiando was afterwards sued out. Several questions arose, and among them this question of the authority of the state magistrate. The supreme court of New York, in their opinion, delivered by Nelson, J. (page 328), use this language: "The question of slave or not, according to

the laws of the state from whence the fugitive fled, belonged to the magistrate under the law of congress to decide, and his decision is conclusive in the matter so far as the state courts are concerned." And again (page 329): "The decision of the magistrate and certificate is conclusive upon the fact as to the state court." This was in 1834. This case was carried to the court of errors, where an opinion against the constitutionality of the act of 1793 was delivered by Mr. Chancellor Walworth, but it does not appear that any other member of the court concurred with him. In Sims's Case, before the supreme court of Massachusetts, in April last [7 Cush. 285], these very questions of the power of the commissioner, the right of a trial by jury, and the right of congress to legislate, were zealously argued and fully considered, and the constitutionality of the act of 1850 unanimously affirmed. The very able opinion of the court, delivered by Chief Justice Shaw, is so recent that it need only be referred to. The same result is ably sustained by the opinion of Mr. Commissioner Curtis in the same case.

Let us next look at the opinions and decisions of judges and courts of the United States. In Ex parte Simmons, in the year 1823 [Case No. 12,863], Mr. Justice Washington of the supreme court heard an application, under the act of 1793, out of court summarily, without any question of its constitutionality. He refused the certificate, on the ground that the alleged fugitive was free. In Hill v. Low [Id. 6,494], which was error from the district court, the constitutionality of the act of 1793, and the right of the state magistrate to grant a certificate, seemed to have been conceded without question; the points raised being only as to the construction of the act. So in Worthington v. Preston [Id. 18,055], where a certificate had been granted by a state magistrate, no question was raised as to the constitutionality of the act of 1793, but other grounds of defence were successfully relied on. See, also, Johnson v. Tompkins [Id. 7,416], and Jones v. Van Zandt [Cases Nos. 7,501, 7,502]. Judge Story, in his work upon the Constitution (volume 3, p. 677), referring to the fourth article, says: "It is obvious that these provisions for the arrest and removal of fugitives of both classes contemplate summary ministerial proceedings, and not the ordinary course of judicial investigations, to ascertain whether the complaint be well founded, or the claim of ownership be established beyond all legal controversy."

We now come to the decision of the supreme court of the United States in Prigg v. Pennsylvania, in the year 1842, 16 Pet. [41 U. S.] 559. In this case the court emphatically affirm the act of 1793. In the opinion of the court, as delivered by Mr. Justice Story (page 622), we find the following decisive language: "We hold the act to be clearly constitutional in all its leading provisions, and, indeed, with the exception of

that part which confers authority upon state magistrates, to be free from reasonable doubt and difficulty upon the grounds already stated. As to the authority so conferred upon state magistrates, while a difference of opinion has existed, and may exist still, on the point in different states, whether state magistrates are bound to act under it, none is entertained by this court that state magistrates may, if they choose, exercise that authority, unless prohibited by state legislation." The question of the power of congress to legislate was an essential and turning point in the cause. It is true that the question of the power of the state magistrate to act summarily was not necessarily raised by the record, but the court nevertheless purposely and deliberately decided it. What they say is not to be classed among obiter dicta. It was not thrown in arguendo, as tending to the conclusions to which they had arrived, but is itself a conclusion which they take that occasion to pronounce, and mean to establish by all the authority of the court. In this all the judges seem to have concurred. Mr. Justice McLean, in a separate opinion given by him, held that state magistrates were not only constitutionally authorized, but bound, to act under the statute. Since that decision was pronounced, there have been three changes in the members of the court, all in the free states, Justices Grier, Nelson, and Woodbury having succeeded Justices Baldwin, Thompson, and Story. In the Case of Garnett, brought as a fugitive before Judge Grier at Philadelphia, in October last [Case No. 5,243], he expressed his determination in the strongest manner to enforce the act of 1850. Its constitutionality was not discussed. A letter subsequently written by Judge Grier holds this language: "A person held as a fugitive under the certificate of a judge or magistrate under this act is legally imprisoned under process from a court or magistrate having jurisdiction." And, again: "Those who believe that the constitution and laws of their country should be regarded and obeyed have no ground of complaint." Here the constitutionality of the act is assumed as unquestioned.

Judge Nelson, in a charge to the grand jury in March last, takes occasion, in very decided language, to affirm the constitutionality of the act of 1850, without exception, and Mr. Justice Woodbury has also expressed his concurrence in those views.

We have thus not only the decision of the highest judicial tribunal in the United States, which alone would be conclusive upon all subordinate courts, but the opinions of all the members of the court in 1842, and all its present members, in support of the constitutionality of the act. Against all this not one decision of any court, state or national, and not one opinion of any judge of the United States, can be produced.

These questions must now be considered as

settled by contemporaneous exposition, by practice, and acquiescence for more than fifty years, by the opinions and decisions of courts and judges, state and national, and especially by the supreme court of the United States. To overturn the construction of the constitution so established would be a most dangerous violation of principle and duty. If a court may do this, it may overturn established rules of property, of personal rights, and of evidence, upon which the community have for a long time acted, and thus shake every man's title, put in jeopardy every man's liberty, and render the law so uncertain that no counsel could advise, and no man act, with safety.