Lockwood, Justice, delivered the following dissenting opinion : I do not concur in the opinion just delivered in this case. It is declared by the first section of the 6th article of the constitution of this state that “ neither slavery nor involuntary servi-tucle shall hereafter be introduced into this state, otherwise than for the punishment of crimes whereof the party shall have been duly convicted.” And by the first section of the 8th article it is further declared “ That all men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, and of acquiring, possessing, and protecting property and reputation, and. of pursuing their own happiness.” From these provisions of the constitution I deduce the following general rule, that all men, whether black or white, are, in this state, presumed to be free, and that every person who claims another to be his slave, under any exception or limitation of the general rule, must clearly show that the person so claimed comes within such exception. The following cases will, it is thought, fully sustain this rule, to wit: Butler v. Hopper, 1 Wash. C. C. R. 499; Ex parte Simmons, 4 Wash. C. C. R. 369; Commonwealth v. Holloway, 2 Serg. & Rawle 305; Lunsford v. Coquella, 14 Martin 465; Commonwealth v. Aves, 18 Pick. 224; Kinney v. Cook, 3 Scam. 233; Bailey v. Cromwell et al. 3 Scam. 73. The same rule of construction is adopted in analogous cases in other countries, “ that is when an institution is forbidden, but when for special reasons, and to a limited extent, such prohibition is relaxed, the exemption is to be construed strictly, and whoever claims the exemption must show himself clearly within it, and when the facts do not bring the case [* 515] within the exemption, the general rule has its effect. Commonwealth v. Aves, 18 Pick. 224. Mr. Justice Story, 'in delivering the opinion of the supreme court of the United States, in the case of Prigg v. Commonwealth of Pennsylvania, 16 Peters 611, sanctions the same principle. He says: “ By the general law of nations no nation is bound to recog-nise the state of slavery as to foreign slaves found within its territorial dominions, when it is in opposition to its own policy and institutions, in favor of the subjects of other nations where slavery is recognised. If it does it, it is as a matter of comity and not as a matter of international right. The state of slavery is deemed to be a mere municipal regulation, founded upon and limited to the range of the territorial laws.”' I am also of opinion that in an indictment for harboring or secreting a slave, the indictment should aver that the accused had a knowledge of the fact that the person secreted or harbored was a slave. I consider the case of Birney v. The State of Ohio, 8 Ohio 230, as laying down the correct rule on this subject. For the grounds of the decision in the case in Ohio, above cited, I refer to the dissenting opinion I delivered at this term in the case of Chambers v. The People, ante 357. The decision in Ohio was pronounced by a highly respectable court, and in a state whose general policy is similar to ours, and on a statute almost identical^ the same. What good reason can be given for departing from the construction of a similar statute in another state, when it must be conceded that in so doing we violate a long and well settled rule of both civil and criminal pleadings, I am at a loss to conceive. Can this court know but that the court below were governed by the principle that the offence was committed, whether Eells knew that the person harbored was a slave or not? And would not the jury have been justified in coming to such a conclusion if the indictment was good ? I am also clearly of the opinion that the power of legislation, on the subject of fugitive slaves, is vested exclusively in congress, and that no state can pass any law to super-add to, control, qualify, or impede the remedy given by congress. If it was intended by the legislature, by the 149th section of our criminal code, to punish, under its provisions, the harboring or secreting a fugitive slave, then I hold that the said section would be unconstitutional and void. I further hold that this section, when used for this purpose, cannot be considered as a police regulation. To sustain these positions I rely on the cases of Prigg v. Pennsylvania, 16 Peters 622, and the case of Jack v. Martin, 12 Wend. 311. Justice Story, in his luminous opinion delivered as the opinion of the majority of the court, in the case in 16 Peters617, says: “That if this be so-(that the legislation of congress upon the subject of fugitives from justice and labor covers the whole [* 516] ground) then it would seem upon just principle of construction, that the legislation of congress, if constitutional, must supersede all state legislation, upon the same subject, and by necessary implication prohibit it.” He also says: “In such a case, the legislation of congress, in what it does prescribe, manifestly indicates that it does not intend that there shall be further legislation to act on the subject manner.” Judge Story argues: “If, indeed, the constitution guaranties the right, and if it requires the delivery upon the claim of the owner (as cannot well be doubted), the natural inference certainly is, that the national government is clothed with the appropriate functions to enforce it.” He further says, that “ The fundamental principle, applicable to all cases of this sort, would seem to be that where the end is required, the means are given, and where the duty is enjoined, the ability to perform it is contemplated to exist, on the part of the functionaries to whom it is entrusted.” In page 622, the same judge says: “ The remaining question is, whether the power of legislation is exclusive in the national legislature or concurrent in the states, until it is exercised by congress. In our opinion it is exclusive, and we shall proceed briefly to state the reasons for that opinion.” Justice Wayne concurred in the opinion of the court, as it had been given by Justice Story. He also gives in his opinion a summary under seven heads of what' that opinion contains. Under the third head he states, “ That no state can pass a law to super-add to, control, qualify, or impede a remedy given by congress.” Under the fourth head he says, “ That the power of legislation by congress is exclusive, and that no state can pass any law, as a remedy upon the subject, whether congress had or had not legislated.” Chief Justice Taney held, “That the owner of a fugitive slave may peaceably seize him, and take him away without a certificate from any officer, and every one that resists or obstructs him is a wrong doer, and every law, either of congress or of a state, that restricts such right is void.” He admits the act of congress, in aid of the owner, is constitutional, and contends that the states may pass laws in aid of the master. He, however, insists that the laws of the different states cannot be supported on the ground that they are police laws. Internal police laws, he contends, are based upon the right to remove from the territory of the state disorderly and evil disposed persons, or those who, from the nature of her institutions, are dangerous to her peace and tranquillity.” He sajrs, “ It would be difficult, perhaps, to bring all the laws I have mentioned within the legitimate scope of the internal powers of police.” Chief Justice Taney also understands the opinion of the court to be, “That the power to provide a remedy for.this right is vested exclusively in congress, and that all laws upon the subject passed by a state are null and void, even although they [* 517 ] were passed in good faith, to protect the owner in the ex- ■ ercise of his rights of property, and do not conflict in any degree with the act of congress.” Justice Daniel was of opinion that the power to legislate was concurrent. He, however, was of opinion that laws made in aid of the master were not police regulations. From a careful' examination of this interesting ease, I have arrived at the conclusion that six of the judges of the supreme court of the United States were of the opinion that the power to legislate on the subject of fugitive slaves was vested exclusively in congress, and that even in the opinion of the dissenting judges, our statute could not be considered a police regulation. I am, however, of the opinion that the legislature of this state never intended to embrace the case of fugitive slaves within the provisions of the 149th section of the criminal code. To render .this position clear, it is only necessary to look into the history of our legislation on this subject. The legislature, at its session in 1822-3, passed a resolution requiring the secretary of state to publish, with the laws passed at that session, a copy of the act of congress in relation to fugitives from justice and labor, and this was accordingly done. The legislature, doubtless, in requiring this law to be published among the statutes of the state, did it that the people might be fully apprised of the penalties to which they would be exposed, if they violated its provisions; and it cannot be supposed that the legislature would pass another law to punish with great severity the same offence. To punish criminally for the same offence more than once is a violation of a great fundamental principle and such an intention ought not to be imputed to the legislature, if any other sensible construction can be given to the statute. If, by the 149th section of the criminal code, the legislature did not intend to punish the harboring and secreting of fugitive slaves, it may be asked to what description of cases did they intend to apply its provisions, where interference took place with the rights of non-resident owners of slaves ? For a true solution of this enquiry, recurrence must be had to the situation of the state at and before the passage of the act. Illinois lies between Kentucky and Missouri. Emigrants and travelers from Kentucky and other slaveholding states have, for years, [been moving] and men were passing through Illinois to Missouri, by thousands, and were accompanied by numerous slaves. The right thus to travel through the state was by common consent, in other words, by comity, universally conceded to the citizens of those states. To prevent persons who, from ignorance of the law, or from sinister designs, might feel disposed to interfere with the rights of masters thus situated, this section of the criminal code, it is reasonable to be presumed, was passed. To this extent I have no doubt the legislature intended to extend the protection of our law. But I can by no means yield [* 518 ] my assent to the proposition that the legislature intended to punish an offence already amply punished under the act of congress ; and if it did, then I am clearly of opinion that its act was void, as being an attempt to legislate on a subject exclusively within the jurisdiction of congress. To construe this section as being a mere police regulation contradicts all my views of such regulations. I never heard our criminal code before designated as police regulations. I have supposed that police regulations related to laws regulating tavern, excises, vagrants and paupers, and not to matters of such high concernment as the criminal code of the state. To apply these principles to the indictment now under consideration, I am of the opinion that the first count is defective, because it contains no allegation of a scienter, and because it does not show how the slave came into the state of Illinois. The person being in this state, and by our laws presumed to be free, the question arises, what takes him out of the operation of this rule? Did he escape from Missouri ? Then he is a fugitive from labor, and the secreting him is an offence against the act of congress.. Did his master bring him here and hire him out ? Then he became free. As this court is uncertain m this respect, there being no allegation in the indictment showing in what manner the slave came into the state, so as to prevent his becoming free under the general rule; for this uncertainty, as well as for want of averment of a scienter, I consider the first count defective. The second count is also bad on both of the above grounds. The third count is bad for the reason of the absence of an averment of a scienter, and also for the further reason that it states the slave to have been a fugitive from labor, and consequently the defendant was punishable under the act of congress. The fourth count was quashed in the court beiow, and the opinion of this court upon that count is therefore not called for. The fifth and last count is defective for the same reasons which are assigned against the soundness of the third count. To prevent the indictment in this case from being drawn into a precedent, I deem it my duty to state that I consider it defective, because the name of the slave nowhere appears. In indictments of this description, I think it is necessary'to give the name of the slave, to apprise the defendant of the particular slave he is charged with having secreted, and also in case of a second indictment, to enable him to plead the former trial without compelling him to resort to parol proof to show that the last indictment related to the secreting of the same slave. Although this defect in the indictment is not assigned for error, I am of the opinion that the court ex mero motu should [*519] reverse the judgment below for this reason. Wilson, Chief Justice, and BROWNE, Justice, concurred in the dissenting opinion of Justice Lockwood. Judgment affirmed,