# COURT OF APPEALS.

WILLIAM T. ERICKSON, administrator, &c., respondent, agt. DAVID D. SMITH and another, appellants.

In an action under the statutes, against the owners of a steamboat to recover damages for causing death, by explosion of a boiler, the *certificate of inspection*, required, under the act of congress of 1852, from the masters and owners of all steamvessels, is competent *evidence only*, of the fact that the inspection had been made in the manner prescribed by the statute. Not as evidence of the facts recited in it.

The statements contained in such certificate, of the general condition of the steamer, the conviction arrived at by the inspectors of the safety of the boilers and machinery, and the fact that she could be safely employed in her business as a passenger boat, without danger or peril to life, are not evidence of facts, but of inferences drawn from them by the inspectors, and for that reason are not evidence against the plaintiff.

Where a public officer may be required by law to make a *return*, and his acts included in the return afterwards become involved in controversy, there, it may be used as evidence. But where no return is required by aw to be made, the certificate of the officer, is not evidence, either for himself, or in behalf of any other person not using it as an admission against him.

Where an objection is made on the trial, to the allowance as evidence of an *opinion* of a witness or his *answer* to a question, if the objection is not made so specific as to indicate any particular reason why the opinion or answer should not be received, this court will not review them.

*June Term,* 1869.

THIS action was brought to recover damages for causing the death of the plaintiff's intestate, which was caused by the explosion of a steam boiler on one of the defendants' boats.

In August, 1865, the defendants were co-partners in business, and were common carriers of passengers for hire, between the city of New York and various places on the Hudson River.

At that time the defendants were the owners of a steamboat called the Arrow, which was used by them in their business.

This was an old boat, having been built about thirty years, and had formerly been called the Broadway.

Prior to her being called the Broadway, the defendants had been the owners of her.

On the 5th of August, 1865, Elizabeth E. Erickson, plaintiff's intestate, a young lady about twenty-six years of age, took passage on the Arrow, for Yonkers.

The Arrow left her dock about four o'clock, P. M., when she arrived opposite Thirteenth street one of her boilers exploded.

At the time the boiler exploded, there was between three and four hundred passengers on board.

Miss Erickson, at the time, was sitting in the upper saloon with a young lady named Gardner.

When the explosion took place, the upper saloon instantly filled with steam. Miss Erickson sprang from her chair and exclaimed, " oh, my, God;" and broke away from Miss Gardner—this was the last that she' was seen alive, Miss Gardner not being able to see where she went, on account of the density of the steam.

Her body was found in the river, a short time after that, with indications of scalds on her face and extremities.

ERASTUS COOK, *counsel for appellants.*

*First.* Dr. Beach who attended the coroner's inquest, had examined the body, and testifies that the death was by drowning; that the body was much decomposed, and the skin easily peeled off. That he did not find any evidence of sclalding.

Then, the plaintiff's counsel asks the Doctor this question:

" *What would have been the indications, if a person was suffocated and afterwards falls or is thrown overboard ?*"

This question was objected to ; the objection overruled, and the defendants excepted.

The witness answered:

" We should have similar indications as we would have from drowning."

The court erred in allowing this question.

It was purely hypothetical; based upon no facts proven or offered to be proven.

At the time this question was put, the only proof in the case of Miss Erickson having been on the boat at all was, that a witness saw her going on the gangway from a quarter to half an hour before the boat started.

We understand that to make the opinion of an expert evidence, it must be predicated either upon facts within his own knowledge, or upon facts testified to by other witnesses; but that it is never admissible upon a direct examination to hypothecate an opinion upon an assumed state of facts, not claimed to have been established. (*People* agt. *Lake*, 12 *N. Y. Rep.*, 358).

In *Dickinson* agt. *Barber*, (9 *Mass. R.*, 227, the court say : " Although the opinion of professional gentlemen, on facts submitted to them, have justly great weight attached to them, yet they are not to be received as evidence unless predicated upon *facts testified either by them or by others.*"

The evidence was calculated to mislead the jury.

*Second.* The plaintiff's witness, Veitch, testified to having seen the body after death, and stated the appearance of the face. He also had seen the dead body of a Mr. Cooper supposed to have been drowned.

The plaintiff's counsel then asked this question:

" Was the face of Mr. Cooper different from the face of this young lady, Miss Erickson ?"

The question was objected to but allowed by the court.

This ruling was erroneous.

It permits the jury to arrive at a conclusion, as to the cause of death, by comparison. (*Van Wyck* agt. *McIntosh*, 14 *N. Y. R.*, 447, *Pr. A. S.* JOHNSON *J.* ; *Odiorne* agt. *Winkley*, 2 *Gallison*, 53).

*Third.* The plaintiff was allowed, notwithstanding the defendant's objection, to ask his own witness: "Did you not swear before the coroner you found scalds over her face and body externally?" This was palpably erroneous, and its mischievous tendency is apparent.

*Fourth.* The court erred in refusing to allow the defendant's counsel to ask the plaintiff, "Have you any capital now?"

The plaintiff is one of the next of kin of his sister, and entitled to share equally with his mother the proceeds of this litigation. (*Laws of* 1847, 576, § 576; 2 *R. S.*, 96, 97). The recovery is to cover the loss sustained by all the next of kin of the deceased. If the plaintiff had capital, or in other words if he was not dependent or likely to be dependent on his sister, either directly or through his mother, he has lost nothing by her death.

The evidence was therefore proper, just as much so as to prove the circumstances of the mother.

The recovery in this case is confined to the actual pecuniary loss. So the judge instructed the jury. (*Laws of* 1847, *p.* 576, § 2).

*Fifth.* The court erred in ruling that the inspector's certificate was not evidence of the facts recited in it, but only admissible to prove that the vessel was inspected.

The rule is laid down by *Starkie* that "certificates and other documents, made by persons intrusted with authority for the purpose, may be considered public documents, and they are evidence against all to the extent of the officer's authority, of the facts which he is directed to certify; for when the law has appointed a person to act for a specific purpose, the law must trust him as far as he acts under its authority." (1 *Starkie's Ev.*, 204).

By the act of congress of 1838, chapter 191, section 4, the inspectors are required, after a thorough examination, to give the owner or master a certificate, in which shall be stated the age of the vessel, when and where originally built,

how long she has been running, and whether, in their opinion, the boat or vessel is sound and seaworthy, and fit to be used for transportation of freight or passengers.

Section 5 relates to the inspection of boilers and machinery of steamboats, and requires a certificate from the inspectors stating the proprietor's opinion "*whether said boilers are sound and fit for use, together with the age of said boilers.*"

Duplicate certificates shall be made, and one delivered to the master or owner, and the other to the collector or surveyor of the port. (*J. Campbell*, 80–1; 5 *U. S. Statutes at Large*, 305, § 4 *and* 5).

A further provision in the act of 1852 requires the inspectors to examine as to every fact certified to in the certificate put in evidence in this case, gives the form of the certificate, which form has been strictly followed here, and requires a record of certificates to be kept by the inspectors. (10 *U. S. Statutes at Large*, 64, 65 & 66).

*Sixth.* The plaintiff should have been non-suited.

1. There was no evidence that Miss Erickson's death was caused by any negligence or other wrongful act of the defendants.

2. The contrary is clearly proved.

*a.* She was not injured by the explosion.

*b.* She madly and recklessly rushed out of the saloon after all danger, if there ever were any, had passed, and probably fell overboard through her own folly, and was the only passenger of the four hundred injured.

The defendants are not to be held liable for her nervousness and want of self-control. And yet there is no other principle upon which this verdict can be sustained.

On this branch of the defense, it is not a case of conflicting evidence.

The deceased, unharmed and in no danger of harm, is so overcome with fear that she, from mere want of prudence, gets overboard and is drowned.

We respectfully submit that in any other kind of action

the court would never permit a verdict for damages so manifestly the result of the plaintiff's own want of care and prudence.

*Seventh.* The defendants were guilty of no negligence.

The boilers had been overhauled and thoroughly repaired but two years previously, and boilers will ordinarily last for three and a half or four years.

The defendants purchased the vessel in April, 1865, and had her inspected and her boilers tested on the 28th of June, but five weeks before the accident.

Each boiler had been subjected to a hydrostatic pressure of 34 pounds to a square inch, and permitted by the inspectors to carry 25 pounds of steam. At the time of the explosion there was but 19 pounds *pressure.*

The hydrostatic pressure is the only way of testing a boiler. There is no other test known.

The engineer testifies, that in his opinion " the explosion was occasioned by a weak spot in the flue. It was so far in that it was impossible to get there to tell anything about it, whether there was a defect in the iron or not."

It is apparent that the accident occurred from a hidden and internal defect, and could not have been guarded against by the exercise of sound judgment and the most vigilant oversight. In such a case the defendants not being common carriers of persons are not liable, *(Ingalls* agt. *Bliss,* 9 *Metc.,* 1; *Camden and Amboy R. R.,* agt. *Burk,* 13 *Wend.,* 611).

*Eighth.* The verdict was excessive. It evidently was arrived at without any reference to the pecuniary loss to the next of kin, and should be set aside and a new trial granted.

IRA D. WARREN, *counsel for respondent.*

I. The plaintiff claims that the defendants were guilty of negligence, in the following particulars:

*First.* In using boilers constructed of iron originally unfit. for the purpose.

*Second.* In using the boilers for so long a time that they were almost entirely worn through, and so weak as to be unfit to withstand the pressure of steam put upon them.

*Third.* In having the stop valve closed on the port boiler, so that there was no means of escape for the steam, generated by that boiler except by an explosion. On these questions the evidence was conflicting.

The jury found a verdict for the plaintiff for $3,000, upon which judgment was entered; from which judgment, and the judgment of the general term affirming the same, this appeal is taken.

There was three questions presented by the facts of this case:

*First.* Were the defendants guilty of any negligence?

*Second.* If they were guilty of negligence, did such negligence cause the death of the plaintiff's intestate without fault on her part?

*Third.* As to the amount of damages the plaintiff was entitled to recover.

The defendants were guilty of negligence in having boilers constructed of iron originally too thin and poor for the purpose.

At the place where it exploded it was about one sixteenth of an inch thick, and dangerous.

It was as thin as a piece of tin.

The thinness of the boiler could have been easily ascertained by a proper examination.

The boiler was patched, one patch upon another, up to the place where it exploded.

"If there was any way by which such defect could be discovered, the defendants are liable, even though they bought the boilers in that condition." (*Hegeman* agt. *Western R. R. Co.*, 3 *Kernan* 9; *Ingalls* agt. *Bills and others*, 9 *Metcalf, Mass.*, 1).

The defendants sought to excuse themselves by showing the inspector's certificate pronouncing the boiler safe to carry twenty-five pounds steam.

" The fact that a statute imperatively requires certain things to be done, such requirements are not necessarily the full measure of the care required in the discharge of the carrier's duties to the public." .(*Priscilla* agt. *N. Y. C. R. R. Co.*, 34 *N. Y.*, 404).

The defendants were guilty of negligence in having the stop valve closed at the time, on the boiler which exploded.

The boiler gave out on the evening previous to the explosion, and on the day in question the boat came down with one boiler.

There is no evidence that it was opened before the boat started on its trip up the river.

Had it been open when the explosion occurred, the steam would all have escaped from the good boiler.

After the explosion, the indicator showed the pressure of eight pounds on the good boiler, so that Spencer was able to work the engine.

Had it been open, the escape of steam through the connecting pipe could have been heard.

The witnesses all agree that when the boat left the dock the indicator showed about eighteen pounds of steam.

The inspector's opinion is that the stop valve was closed and that caused the explosion.

One of two things is certain ; the boiler was too weak to withstand the pressure of eighteen pounds of steam, or the stop valve on the port boiler was closed, so that the indicator did not show the pressure on that boiler. If it was closed there might have been a pressure of one hundred pounds, and the indicator would not have shown it.

In either case the defendants were guilty of negligence.

The fact that the boiler exploded is itself sufficient to charge the defendants with negligence. This seems to be the rule, and is, indeed, the only reasonable rule where the

damage is caused by the failure of any machinery used by the defendants. (*Christie* agt. *Grigg*, 2 *Campbell*, 79; *Great Western R. R. Co. of Canada*, 1 *Moore Privy Council Cases*, N. S.. 101; *Curtis* agt. *Rochester & S. R. R. Co.*, 18 N. Y., 544; *Steamboat New World* agt. *King*, 10 *How. U. S.*, 476; 5 *U. S., Statutes at Large, page*, 306, *Act July*, 1838, § 13).

It rested therefore upon the defendants to show some excuse satisfactory to the jury why the boiler exploded. This question was properly left to the jury, and their finding is conclusive.

II. The body of plaintiff's intestate was found in the river four days after the explosion took place, with indications of scalds on her face and extremities.

The physician gave it as his opinion that the immediate cause of her death was drowning. By what means she got into the river no one could tell; no one saw her fall; no one saw her after she fell, although the occurrence took place in broad day, and in the immediate presence of more than three hundred people.

The scene was one of wild terror and confusion; each passenger was attending to his or her own safety; the state of things on that boat is perfectly clear, when it appears that not only the plaintiff's intestate, but others fell or were blown into the river and drowned, and not a person on the boat saw one of them or knew of it until the boat landed.

It is evident the plaintiff's intestate was scalded in her face, and, either blinded by the scalds, she rushed overboard, or was pushed overboard by the crowd rushing about for a place of safety.

Whether she judged rightly in what she did in the hurry or agony of the moment, or whether if she had acted differently her life might have been spared to her friends, is not enough to charge her with negligence. Some allowance should be made for errors of judgment, and to human weakness in a case of great and sudden calamity. This

question was fairly submitted to, the jury under instructions which have been fully approved in such cases. (*Buell agt. N. Y. C. R. R. Co.*, 31 *N. Y.*, 314; *Ingalls agt. Bills*, 9 *Metcalf*, 1).

The question of the plaintiff's intestate's, and defendants' negligence were fairly submitted to the jury. It is a question for them to determine, and their finding is conclusive. (*Ernst agt. Hudson, R. R. C.*, 35 *N. Y.*, 1).

III. The following were the *only exceptions* urged at the general term, as reasons why the judgment should be reversed.

1. Plaintiff's counsel asked the physician who saw the body at the coroner's inquest, the following questions:

"What would have been the indications if a person was suffocated and afterwards falls, or is thrown overboard?"

This question was asked on a *re-examination* of this witness, to test the accuracy of his opinion on his cross-examination that death was caused by drowning. His opinion that death was caused by drowning, was based on the fact that the tongue was firmly grasped between the teeth.

We asked the question to show, and we did show, that the same indications were produced by suffocation; she might, therefore, have been suffocated by the steam and fallen overboard.

2. Plaintiffs asked the witness Veitch this question:

"Was the face of Mr. Cooper different from the face of this young lady?"

This question was asked as a re-examination of this witness. On his cross-examination they called out the fact that a Mr. Cooper was on this boat and was picked up by the witness at the same time; also the fact that Miss Erickson was scalded and drowned.

The doctor had testified as to the appearances in cases of drowning and suffocation, and it was proper for us to show the appearance, if this witness knew. He did not know, however.

This question was, if there was a difference; it was only a preliminary question. It was therefore proper. (*Kerr* agt. *Maguire*, 28 *N. Y.*, 450).

The witness was not asked to state how they differed and there was no comparison.

The physician, on his examination, testified that she was, in his opinion as a man of science, scalded. The witness Veitch, in his cross-examination testified to the same thing, and as this is the only testimony on the subject, the defendants were not harmed by the question even if it was not proper. The fact that she was scalded is not disputed.

3. Plaintiff asked the physician this question, " did you not swear before the coroner that you found scalds over her face and body externally?"

The court will see, on looking at the testimony of this witness, that to the second question put to him, he swears that he examined the body superficially—*not enough to see whether she was scalded or not.* He was then shown a paper which he swears was his evidence sworn to before the coroner, and asked the question which is objected to.

He finally swears, that he probably recollected better when he was sworn before the coroner, and then says, " my opinion, as a man of science, was that there were scalds." He was shown his evidence before the coroner, which was all written by himself, and asked this question for the purpose of refreshing his recollection.

This witness exhibited a melancholy spectacle of failing recollection which required the counsel, jurors and court, and his sworn evidence in his own handwriting, to revive.

He was more than an unwilling witness, he was stubborn, conceited and wilfull, and the latitude allowed on the examination of such a witness is wholly with the judge who tried the case. (*Blach* agt. *Camden & Amboy R. R. Co.*, 45 *Barb.*. 40 ; *Cheeney* agt. *Arnold*, 18 *Barb.*, 439 ; *Affirmed*, 15 *N. Y.*, 345).

4. The defendant's counsel asked the plaintiff this question:

Have you any capital now? The plaintiff was one of the next of kin of the deceased, and the defendants claim that if he was not likely to be dependent on his sister, either directly or indirectly through his mother, he has lost nothing by her death.

The pecuniary injury the next of kin sustain cannot depend upon the amount of capital each one of them has, or the amount each is worth.

The pecuniary injury must necessarily be based on very many probabilities and possibilities of human life; but the fact that the next of kin of the deceased had more or less property, could scarcely make the pecuniary value of such life worth less or more according to the amount they possessed.

This objection, however, is fully answered by the fact that this case was submitted to the jury on the theory that the mother alone was the next of kin. So that the only damage recovered was the damage the mother sustained as next of kin. Nothing was given for the damage the plaintiff sustained as next of kin; therefore the question was of no importance, even if the defendants were right in their view of it.

5. The defendants offered in evidence a certificate of certain inspectors that they had inspected this boat.

This was objected to by the plaintiff; the court admitted the certificate in evidence for the purpose of showing that the boat had been inspected as required by law, but not as evidence of the facts recited in the certificate.

The plaintiff then read the certificate to the jury.

This certificate is made in pursuance of an act of congress (*Act of* 1838, *Chap.* 191 *Sec.*, 5,) which requires the inspector to state his opinion whether said boilers are sound and fit for use, together with the age of said boilers. This certificate was not evidence of the facts stated in it for the reason that the act of congress does not make it evidence.

It would be giving the statements or declarations of the

inspector as to the soundness and fitness of these boilers, instead of his sworn evidence. The certificate was admitted and read in evidence.

No exception was taken by the defendants to the charge of the judge limiting its effect.

After it was admitted and read, it stands as though no objection had been taken to it, except as it is afterwards restricted in its effect by the direction of the court to the jury. (*Murphy* agt. *Boker*, 28 *How.*, 261).

IV. The defendant has not stated the ground of his objection to a single question in the case; this he should have done to make them the subject of review in this court. (*Valton* agt. *National Life Ins. Co.*, 20 *N. Y.*, 35 ; *Mabbett* agt. *White*, 12 *N. Y.*, 451 ; *Cayuga Co. Bank* agt. *Warden*, 2 *Selden*, 30).

V. The question of damage was one exclusively for the jury. (*Laws of* 1849, *Chap.*, 256). The statute so declares, restricting it however to $5,000. The plaintiff can recover without showing any pecuniary injury. (*Baron* agt. *R. R. Co.*, 5 *Wallace*, *U. S.*, 90 ; *Oldfield* agt. *Hudson R. R. R. Co.*, 14 *N. Y.*, 310, 318 ; *McIntire* agt. *N. Y. C. R. R. Co.*, 37 *N. Y*).

In this case, however, the pecuniary injury was shown. The earnings of the deceased contributed to her mother's support, was more than the income from the verdict.

The question of damage is one this court will not disturb.

VI. The judgment of the general term should be affirmed, with costs and ten per cent. damages.

*By the court,* DANIELS, J.—The questions presented for decision upon this appeal arise under the rulings of the court before which the trial was had concerning the admission and rejection of evidence. The first of these in importance is that which related to the certificate of inspection of the steamboat on which the explosion took place. That inspection and certificate were made on the 25th day

of June, 1865, and the explosion occurred on the 5th day of the following August. The steamboat was a passenger boat, and that circumstance as well as the form of the certificate itself indicate that she was inspected under the act of congress passed August 30th 1852, and not made under the act of 1838.

But whether it was made under one or both of these acts is a matter of not the least importance upon the present occasion, because that does not affect the disposition of the questions raised upon the trial. The substantial reasons, if any exist for allowing any greater force or effect to the certificate than it was allowed to have upon the trial, depend upon the act of 1852.

For under that of 1838, the inspectors were not required to ascertain and certify to facts within their own personal observation, but were permitted to obtain them from other sources and then to embody them in their certificate. This was to ascertain a statement of the age of the boat, when and where she was built and the length of time she had been running, whether in their opinion the boat was sound, seaworthy and fit to be used for the transportation of freight or passengers, and whether in their opinion the boilers were sound and fit for use, to which was required to be added a statement of the age of the boilers. (*U. S., Statutes at Large, Vol.*, 5, 305, §§. 4, 5).

From the nature of the duty imposed by this act, it is clear, that they were required to state no fact beyond that of inspection alone. For all the other matters required to be contained in the certificate consisted of the opinions of the inspectors concerning the condition of the boat and her boilers, and of facts necessarily derived from information acquired from other persons. And for those reasons it could not when made, be competent evidence in an action between her owners and other persons in no way connected with the examination, inspection and certificate made.

But the act of 1852, is more comprehensive as well as

more definite in its requirements.  By that the inspectors
were to satisfy themselves that the steamboat was of a
structure suitable for the service in which she was to be
employed, and in a condition to warrant the belief that she
might be used in navigation as a steamer with safety to
life, and that all the requirements of the law had been com-
plied with regarding fires, boats &c.    They were also
required to inspect the boilers and subject them to the
hydrostatic pressure prescribed, and to satisfy themselves
by examination and experimental trials that the boilers were
well made, of good and suitable material ; that the openings
for the passage of water and steam respectively, and all
pipes exposed to heat, were of proper dimensions, and free
from obstruction ; that the spaces between the flues were
sufficient ; that the fire line of the furnace was below the
water-line of the boilers, and that such boilers and machinery
could be safely employed in the service proposed without
peril to life.

   They were also required to satisfy themselves that the
boilers, flues and other machinery connected with them, in
other respects were in such a condition as to render them
capable of being safely used in the business in which the
steamboat was to be employed, and were prohibited from
approving any boiler or pipe made wholly or partially of
bad material, unsafe in its form, or dangerous from defective
workmanship, age, use, or any other cause.    And after
making such inspection in detail if they approved of the
steamboat, they were then required to make and subscribe
a certificate to the collector of the district, in the form
prescribed by the act.    This certificate enumerating and
describing the boilers and machinery found on board the
steamboat, and her accommodations and capacity, was also
required to contain the statement that she was in all
respects staunch, seaworthy and in good condition for navi-
gation, and that it was their deliberate conviction, founded
on the inspection made by them, that she could be employed

as a steamer upon the waters named in the application for inspection, without peril to life, from any imperfection of form, materials, workmanship, or arrangement of the several parts, or from age, or use. (*U. S., Statutes at Large, Vol.,* 10, 64–5–6).

This inspection and certificate were rendered necessary for the purpose of entitling the master and owners of the boat to the papers required by and enabling her to engage in the business of navigation under the laws of the United States, (*Id.,* 61, § 1). And to that extent the certificate necessarily became conclusive upon the officer whose furture conduct was required to be based upon it. But beyond the effect to be given to it, which must be implied from that circumstance, the act contains nothing giving it the nature or character of evidence, in controversies between the owners of the steamboat and third persons, involving the condition of her boilers and machinery.

As proof of the fact that the inspection had been made in the manner prescribed by the statute and the law so far had been complied with, it may very well be that it was competent evidence. And for that purpose it was received upon the trial of the present action. This was clearly the understanding of the court. For when it was alluded to in the charge, it was stated that it had been admitted for the purpose of allowing the defendants to show that they had caused the engine to be inspected, and the certificate to be given which the act of congress required in order to allow them to run the boat. Beyond that certainly, from the nature of the duties to be performed, and the form of the certificate required to be given, by the inspectors, its effect as evidence ought not to be extended. They were required to do certain things by way of performing their duties, and that they did them, and in the mode prescribed by the statue, presumptively followed from the fact of the inspection itself.

By allowing the certificate to be used as evidence of the

inspection, and that the law in that respect had been com-
plied with, the defendants had the benefit of the facts that
the required inspection and examination had been made,
and the pressure applied, presribed by the terms of the
statute.    But the statements make beyond that, of the
general condition of the steamer, the conviction arrived at
by the inspectors of the safety of the boilers and machinery,
and the fact that she could be safely employed in her
business as a passenger boat without danger or peril to life,
were not evidence of facts, but were inferences drawn from
them by the inspectors, and for that reason were not evi-
dence against the plaintiff.    And this was the only restric-
tion imposed upon its use as evidence by the court at the
trial, if indeed, from the ambigious and uncertain statement
of the ruling contained in the case, even so much as that
can be accurately said to have been done.

The statement of the ruling is that the certificate was
received as evidence showing the inspection, but not as
evidence of the facts recited in it.    Which was entirely
accurate, whether it included more or less than has already
been supposed to have been within the ruling; for it is
very well settled that the recitals contained in an instrument,
are never evidence against a stranger to it, as the plaintiff
in this case most clearly was.    (2 *Cowen & Hill's, Notes,* 3
*ed.,* 453, *and cases there cited*).

The authorities referred to by the defendant's counsel do
not warrant the conclusion that this certificate should have
had any greater force than was given to it as evidence upon
the trial of this cause.    The rule stated by *Starkie,* (*Vol.,* 1
173,) is entirely unsupported by the case cited by him as
sanctioning it.    And he himself appears to have doubted its
accuracy, for he has followed his reference to the case, on
which he asserted it, with a query; upon consulting it, this
case will be found to contain nothing whatever indicating
the propriety of such a doctrine. (*See Butt* agt. *Ward,
Winch,* 70).    And the principle previously mentioned by

this author is entirely at variance with any rule that would render this certificate evidence of the inferences and conclusions of the inspectors, or of anything beyond the fact that the inspection and examination of the boat had been made as the statute required that to be done.

For he says, "that neither the declarations nor any other acts of those who are mere strangers, or, as it is usually termed, any '*res inter alios acta*,' is admisible in evidence against any one, as affording a presumption against him, in the way of admission or otherwise. In general it would be contrary to the first and most obvious principles of justice, that any one should be bound by the acts, or concluded by the declarations, or, assertions of others to which he was nowise privy. Hence it is that no man is bound by any decree or judgment as to any matter of private right litigated in a suit to which he was not privy." (*Starkie on Evidence, Part* 1, § 32.)

In the case of *Clintsman* agt. *Northrop*, (8 *Cow.*, 45,) the question was not considered how far the act of the inspector of the leather was evidence against the defendant. But it was held that it was not conclusive, as the court upon the trial had held it to be. And that was all that was decided on that occasion. And no more than that was decided in the case of *People* agt. *Peck*, (11 *Wend.*, 604). The decision was that the certificate was evidence but to what extent it was deemed to be so was not stated. And besides the circumstances under which that certificate was made were more favorable to its admissibility as evidence than those which existed in this case. For when legally and properly given it necessarily constitutes the evidence contempleted by the statute of the election of the trustees. In the case of *Jack* agt. *Martin*, (12 *Wend.*, 311,) the effect to be given to the certificate was expressly declared by the act of congress under which it was made, and precisely that, and nothing beyond it, was given to it in that case. The cases of the *United States* agt. *Bauner*, (1 *Baldwin*, 234,

*and the Same* agt. *Siddle,* 2 *Wash., Circuit Court Cases,* 205,) were peculiar and unusual. They involved the rela tion of certain foreign representations to the government of the United States. A fact peculiarly within the knowledge of the secretary of state, and dependent upon his action. And for that reason his certificate that they had been accepted and recognized as such by the department over which he presided was held to be evidence of that fact, for it showed that to have been the act of the government required for that purpose.

Where a public officer may be required by law to make a return, and his acts included in the return aftewards become involved in controversy, there it may be used as evidence. But where no return is required by law to be made, the certificate of the officer, is not evidence either for himself. or in behalf of any other person not using it as an admission against him. The rule upon that subject has been stated to be that, " where the law has made it the duty of a public officer to make a return of his doings, and has made him responsible for the truth of his return, a return may be evidence." (*Stephen* agt. *Clements,* 2 *N. H.,* 390, 391). And this has been approved in the cases of (*Hathaway* agt. *Goodrich,* 5 *Vert.,* 65 ; *Oakes* agt *Hill,* 14 *Pick.,* 442, 448). But the obligation imposed upon the inspectors of returning their certificate to the collector, was not such a return as this rule contemplates.

The rule contained in *Greenleaf* on this subject is stated to be that: " In regard to certificates, given by persons in official station, the general rule is, that the law never allows a certificate of a mere matter of fact, not coupled with any matter of law, to be admitted as evidence." (1 *Greenleaf,* § 498). This statement of the law is exceedingly indefinite and unsatisfactory, but still it affords no support to the case presented by the defendants. In the *People* agt. *Minck,* (21 *N. Y.,* 539,) the inspectors return was held to be evidence because the general principles embodied in the

statute established that to be their character. And besides that it was plainly within the rule mentioned by the supreme court of New Hampshire ; none of these cases sanction the principle contended for by the defendants.

The objection taken to the question put to the witness Beach, as to what would have been the indications of a person was suffocated and afterwards falls, or is thrown overboard, was somewhat singular and peculiar. It was that there was no evidence to show that the deceased had been thrown overboard, and there is no pretence that she was. As the plaintiffs right to propound this question did not depend entirely upon that circumstance, there was no impropriety in allowing the question to be answered. The objection that the opinion of the witness was incompetent was not included in the ground taken at the trial.

The witness Veitch, after having been examined by the defendant's counsel relative to the appearance of a young man, that had been on board the same steamboat, at the time of the explosion, and was afterwards found in the water, was asked by the plaintiff's counsel whether his face was different from the face of the intestate. This inquiry was objected to by the defendant's counsel and allowed to be answered by the court. There was no impropriety in this ruling, because the subject had been opened and the question invited by the course taken upon the cross-examination of the witness. But if there had been, the defendants would be unable to render it of any service to their defense, because the objection was not made so specific as to indicate any particular reason why the question should not be answered, and in addition to that the witness gave no evidence by his answer which could possibly prejudice them.

The same deficiency is also found in the objection taken to the question asked concerning the answer given by the plaintiff's witness upon his examination before the coroner. It was too general to be of any service to the defendants

under the rule which has now become well settled by the decisions of this court.

The evidence given upon the trial rendered the questions arising upon its effect, those of fact proper for the consideration and decision of the jury. · The court was therefore right in declining to non-suit the plaintiff.

The judgment should be affirmed.

NOTE. The copy of the above opinion, from which we published, is certified in the following manner, to wit: "A copy, *but not for publication*, S. HAND, State Reporter, Fees $3.50." (The price of 1st *Vol., Hand*, is $2.50). Whether any fees are included in the above amount of $3.50, for the above *preliminary injunction*, issued against the attorney who procured this certified copy, or whether such fees are to be ascertained on a reference, for a violation of the injunction, *does not appear*. However that may be, the attorney in this case is more fortunate in procuring a copy of the opinion, on any terms, than another attorney of N. Y. City, was last Summer, when the court was being held here; as the latter applied to the reporter for a copy of an opinion in a cause in which he was concerned, and in conversation, very innocently remarked that he intended to give it to *Howard* for publication, (supposing there were points in it which ought to be published in *Howard's Pr. Rep's.,*) whereupon, he was utterly refused a copy, although the attorney offered to pay the reporter his fees therefor, at once. Whether the attorney ever succeeded in getting a copy we never learned, but we did learn of the transaction at the time, and concluded then that if the reporter had decided to monopolize and control the publication of the opinions of the court of appeals, he had undertaken a "big job"; but thought, as he was newly appointed that a little experience and reflection would correct his views on that subject; the result however, seems to be quite otherwise; for, although there is a condescension to allow attorneys to have copies of opinions, they are formally and strictly enjoined that they are not to be used for publication.

Now, we believe that under the amended judiciary article in the constitution adopted in 1869, the court of appeals have the power of appointment and removal of the reporter of that court, and it would seem that this provision in the new judiciary article will not go into effect any too soon, to save the rights of the profession, if not the reputation of the court, by prohibiting a self consequential official from assuming to insert an *unconstitutional addendum* to every opinion certified from that court. (REP).